## Farrell, to the use of Hughes, *versus* Lloyd.

1. In the question of a resulting trust for a son in land bought by his father by articles; that the father had not sufficient means, that the son had, that the father about leaving home, said he was going to a locality named near where the land was to buy land for the son, that the son then handed him money, and that this was about the time the land was bought, was evidence on which a jury might find the trust.

2. After the father's death the vendors under an indemnity from the son against any claim by his father's heirs, made the deed to him. The son afterwards sold the land; in a suit by him against his vendee for unpaid purchase-money, in which the vendee set up the title in the heirs of the father and in which it was alleged the vendee agreed to take the risk of the title, *Held*, that the son, knowing he had paid for the land, was not bound to inform his vendee of his having given the indemnity.

3. If he had not paid the purchase-money and did not disclose that fact to his vendee, the vendee was not bound by an agreement to take the risk of the title.

4. Lloyd *v.* Farrell, 12 Wright 73; Lloyd *v.* Lynch, 4 Casey 419, compared.

May —— 1871. Before READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Blair county:* No. 73, to May Term 1871.

On the 7th of February 1856, a judgment, Thomas Farrell for the use of Charles Hughes against Gilbert L. Lloyd, for $2000, was entered in the Court of Common Pleas of Blair county by virtue of a warrant of attorney. On the 24th of September 1857, the defendant made an affidavit, that on the 1st of July 1854, he had bought from the plaintiff Farrell a tract of land warranted in the name of Abraham Bell for $6000, of which $1000 were paid in hand, and for the balance the defendant gave his bonds; one of them—that upon which the above judgment was entered—being for $2000, payable on the 1st day of July 1855; that on the day of the purchase the plaintiff delivered to the defendant an absolute deed in fee simple for the land, with covenant of warranty; that after the purchase, Catharine Lynch instituted an action of ejectment, in which she recovered an undivided third part of the land; the affidavit further averred that the land had been purchased by Barnabas Farrell by articles of agree-

[Farrell *v.* Lloyd.]

ment from James Ross and Peter Collins, to whom a portion of
the purchase-money had been paid; that Barnabas Farrell died
leaving three children, Thomas the plaintiff, Catharine Lynch and
Elizabeth McCormick; that after the death of Barnabas, a deed
was executed by Ross and Collins to Thomas the plaintiff for the
whole tract; that Elizabeth McCormick had died leaving her hus-
band and a minor child by whom the interest of Elizabeth in the
tract was claimed, &c. On this affidavit the court on the 26th of
August 1858 opened the judgment, and let the defendant into a
defence. A trial had October 30th 1862 resulted in a verdict in
favor of the plaintiff for $2880. The judgment on this verdict
was reversed by the Supreme Court on the 22d of June 1864,
and a venire de novo awarded (12 Wright 73). The case was
again tried, February 2d 1871, before Taylor, P. J.

The plaintiff gave in evidence the record of the judgment and
rested.

The defendant then gave evidence, viz.: Articles of agree-
ment, dated October 7th 1841, between James Ross and Peter
Collins of the one part and Barnabas Farrell of the other part,
by which Ross and Collins sold to Farrell the tract of land con-
taining 359 acres and 95 perches for $375, of which $160 were
paid on the execution of the articles—$130 to be paid on the 1st
of May 1842, and the remainder on the 1st of May 1843: a deed
with general warranty to be made to Farrell upon his making the
second payment.

Barnabas Farrell died October 24th 1841, leaving three child-
dren, as set out in the defendant's affidavit.

On the 9th of January 1843, Ross and Collins by deed with
general warranty, acknowledging the payment of the purchase-
money, $375, by Thomas Farrell, conveyed the land to Thomas
Farrell in fee.

On the — day of May 1854, Farrell the plaintiff, by articles,
sold the land to Lloyd the defendant for $6000, of which $1000
were to be paid on the 1st of July 1854, when a deed was to be
delivered to Lloyd,—$2000 on the 1st of July 1855; $2000
on the 1st of July 1856, and $1000 on the 1st of July 1857,
these payments to be secured by bond and mortgage.

On the 1st of July, Thomas Farrell conveyed the land to
Lloyd in fee by deed with special warranty. On the 6th of
March 1857, judgments were entered on the bonds for the other
two payments of $2000 and $1000 respectively.

The defendant read the deposition of Ross, in which he testified
that shortly after Barnabas Farrell's death and after the second
payment for the land was due, he and Collins went to see about
the payment, they saw Thomas. Ross asked him how he expected
to get the deed, as they were bound to make it to his father, and
he had left a widow and two daughters. Thomas gave a good

[Farrell v. Lloyd.]

many reasons why he should have the deed: one was that it was his money that had paid for the land; Ross was unwilling without a release from the widow and daughters. Collins insisted that the deed should be made. They finally agreed, upon Thomas entering into an agreement in the penalty of $500, to procure releases from his mother and sisters, to make the deed to him. Thomas gave his note to Ross for $75, which he afterwards paid.

The defendant then gave in evidence the records of two actions of ejectment against Lloyd, one by Lynch and wife to April Term 1855, and the other by Rosanna McCormick to July Term 1856, each for an undivided third of the land; also conveyance by Michael McCormick, May 21st 1859, of his interest as surviving husband of Elizabeth, late Farrell, to Lloyd, and a record of the Orphans' Court showing the sale of Rosanna's interest to Lloyd, confirmed January 23d 1860. The defendant then rested.

For the plaintiff, William Lloyd testified: " I was here when this article of agreement was made. They had contracted prior to the date of the article of agreement, about the purchase of this tract of land. They had conversations about it, and contracted for it. On the day it was executed, Gilbert Lloyd came out from Hollidaysburg with the article prepared. He brought it into our office prepared. Farrell was present before the execution of the article, and refused to sign it, alleging that it was not a conveyance of the tract, not in accordance with the agreement. Gilbert L. Lloyd said that the understanding was that Lloyd was to take the land—the Farrell title—at his own risk. They talked the matter over and both agreed to this. It was executed with that distinct understanding, Farrell all the time refusing to sign it. I said it was a distinct understanding of the parties, and not mine, that Lloyd was to take it at his own risk. I had told Farrell not to sell unless he got that agreement. Other parties wanted to buy the land at the same time, and I told Farrell not to sell the land except at the purchaser's risk, because there was a good deal of litigation about lands on the mountain, and they had been comparatively worthless before that, and that there was no use in him selling the tract of coal-land at that price, that persons were wanting it that would guaranty the title. The Portage and Central Railroads were then making and opening up this country and making land valuable. This was the understanding of the parties at the time they signed the deed. The same understanding was had in regard to the title at the signing of the deed as at the signing of the article of agreement; that is at the execution of the deed. I was there then and witnessed the deed. This understanding was the understanding of the parties, Gilbert Lloyd and Thomas Farrell. Farrell refused to sign on any other conditions. * * * Thomas said nothing about his sisters having a claim there, or anybody having a claim there."

19 P. F. Smith—16

[Farrell *v.* Lloyd.]

The plaintiff read also the deposition of Peter Collins, in which he said :—

" James Ross and I owned a tract of land warranted in the name of Abraham Bell. Some time in October 1841, Barnabas Farrell came to see me about purchasing land. He stated to me for his son Thomas. I went with him and showed him the land; then we went back to Ebensburg, where he agreed to purchase the said Abraham Bell tract for the sum of $375. James Ross wrote the article. He paid $168 at the making of the agreement. Sometime afterwards Thomas Farrell, only son of the said Barnabas Farrell, now deceased, came and gave his judgment-note for the balance of the purchase-money, and we made the deed to him for the land. He afterwards paid me my half of the judgment-note, and I believe paid the other half also. The deed was made to Thomas Farrell, the son, because his father told me when bargaining for it, that he bought it for the son. This he said on the day of examining the land before the agreement was signed. There was not any one present when he said this. * * * He said he was buying it for his son." * * *

The plaintiff offered in evidence the deposition of Robert Lemon, for the purpose of proving the declarations of Lloyd that he had made $30,000 or $40,000 by his purchase of the land. This was objected to by the defendant, rejected by the court, and a bill of exceptions sealed.

Thomas Farrell, Sr., a brother of Barnabas Farrell, testified : " Thomas was born in Ireland in 1819. I sent for him and he came straight to where I lived. He worked under me for Dr. Shoenberger and earned over $100, and sent for his father and mother and all the rest of them, and paid their passage over. He was working on there after the old man came, at the same place, and saved money and provided a house and furniture for them, and a way of living. He was saving of his money and laid it out on them. The old man had no means when he came. After the old man's death, Thomas supported the family."

Jonathan Zerbe testified : " I was book-keeper for Mr. Spang in 1839 at Canoe Furnace. At that time Thomas Farrell was working in the mine-bank for Spang. He worked there from sometime in June 1839, and continued on working there until I left in March 1841. The books show that he worked there sometime after. This is the account I kept there. His father commenced work there sometime in November 1839." Witness then gave a statement from the books of the account of Thomas up to April 1st 1841, and proceeded : " There are two drafts charged here 6th of April 1841 : ' Thomas Farrell to Bills Payable for note of hand payable 1st of October 1841, $156.' Also another note payable 1st of April 1842, for $156. . The accounts from the time old Mr. Farrell came there were kept together as the account of

[Farrell v. Lloyd.]

Thomas Farrell. The time the notes were given, the amount derived from Thomas's labor would be $340.80. The old man's I have not ascertained. I presume he drew fully to the amount of his own earnings. I have made an examination with that purpose in view. The old man was brought there by Thomas Farrell, I think from Woodberry Furnace. I am not positive. I don't know anything about Thomas bringing the old man from Ireland. Those notes drawn in April closed the account. The old man had his family there."

William Yon testified: "Lived with father on farm of B. Burns in 1841, in Canoe Valley, two miles this side of Williamsburg. Knew Thomas Farrell and his father at that time. Went there one morning to haul wood for them, and as I drove up to the house the old man Farrell was before the door in the yard and a man named Burns. I walked into the yard and Mr. Farrell said that he was going to the mountain to buy a piece of land. He said that Thomas had got a little money, and said he wanted to put it into land. He said he was going to buy a tract adjoining Burgoon's lands on the mountain. I told him I knew near about where Burgoon's lands were; that I had hauled coal from there. While we were talking Thomas came out of the house and handed over some money to his father, and I walked out towards my team, and afterwards Thomas came out and he and I went on and hauled the wood. I was at the funeral of Barnabas Farrell. Think that was in 1841 or 1842. Some four or five months before that I heard this conversation. It was right in front of the house. I went there with my team to haul wood, and into the yard where the old man and Burns were standing before the door. Took notice that he had his good clothes on, and then he told me that he was going up to the mountain to buy a tract of land."

The court charged: * * *

"The first inquiry is: Is there a proven failure of the title? And, secondly, if there is, did Mr. Lloyd agree to take upon himself the risk of the title, including such defect, so as still to be liable for the purchase-money?

"I. Is there a proven failure of the title? It is not necessary here that we should dwell at length upon the evidence involved in this part of the case. [The papers in evidence show that Thomas Farrell held the title for himself, and in trust, as to two-thirds of it, for his sisters, Catharine Lynch and Elizabeth McCormick; and this in view of, and notwithstanding all the evidence offered for the purpose of showing that the land was bought by Barnabas Farrell, their father, in his lifetime, for Thomas;] and we are asked here to instruct you that there is no evidence on the subject upon which the case should be submitted to you. * * *

"We have the testimony of Mr. Zerbe as to both of them working at Spang's Furnace; and the testimony of Mr. Farrell as to the time Thomas and his father came to this country from Ireland,

[Farrell *v.* Lloyd.]

and the circumstances under which they came. It would seem from this that Thomas had first gone to Canoe Furnace (Spang's) sometime in 1839, and that shortly afterwards the old man came; that he lived with the old man, the family living together, and that both worked at the furnace. It seems that their accounts were kept together; first opened in the name of Thomas, because he was first there, and so kept after the old man came. A balance in their favor seemed to have been accumulating, until, about the time they quit, two notes, as the books show, were given to the old man, amounting to about $300. It would seem probable that these notes were for the surplus earnings of both. The notes were given to the old man. [According to the testimony of old Mr. Farrell, Thomas was born sometime in 1819. He could not fix the time of the year. Consequently, what was earned by Thomas at the furnace previous to 1841, while he was under age, and living with his father, according to the general rule of law, would belong to his father. It seems that, on the settlement, the notes for the balance due on their account, were given to his father; and the money was due from the furnace on the notes to him, though earned principally, it is probable, by Thomas; and this is the money, it is likely, which the old man referred to at the time of the purchase,.as coming to him at Spang's furnace. He made the purchase in his own name.

"This evidence was all before us on the trial of the ejectment, and the former trial of this case; and upon it (without the testimony of Yon) we are constrained to say that it was not sufficient proof of the payment of Thomas's money in the purchase to establish a resulting trust in his favor, and that it was not such evidence as we should submit to the jury. Does the testimony of William Yon alter this aspect of the case? On looking at it carefully, we say that we do not think it does. Taking it all as true, as the witness states it, it is a mere statement made by Barnabas Farrell that he was going to the mountain to buy land; and that Thomas had money that he wanted to put into land. There was no particular or exact specification of what land, or of any person he was going to deal with. * * * And it seems to us clear that the case is not materially changed by this evidence from what it was before. Taking it all together, as we have it now, and judging of it by the settled rules fixing the amount and character of evidence which must exist in order to warrant a chancellor to infer a resulting trust, we say that the case is not materially altered; and that it stands in this respect where it stood before, when we instructed the jury that the papers in evidence showed that Thomas Farrell held the title, as to two-thirds, in trust for his sisters, Catharine and Elizabeth; and this, notwithstanding all the evidence (including the evidence of William Yon) offered for the purpose of show-

[Farrell *v.* Lloyd.]

ing that the land was bought by Barnabas Farrell, their father, in his lifetime, for Thomas or with Thomas's money.   Our former ruling was affirmed; and you are instructed now, as the former jury was instructed, that there is no evidence upon this subject upon which the case should be submitted to you.

" The conclusion is, that there is a proven failure of the title conveyed to the extent of the undivided two-thirds with respect to which Thomas is shown by the evidence to have held the title as a trustee for his sisters; and the effect must be to relieve the defendant to that extent, unless he is shown to have taken upon himself the risk.] * * *

" Did Mr. Lloyd agree to take upon himself all risk of the title, and does the evidence plainly show it, without any fraud being practised upon him ?

" II. This is the inquiry presented on the former trial, and this is the question upon which the case turns now.   It turned before on the testimony of one witness—Wm. M. Lloyd; and it is here now before us on the testimony of the same witness, with no additional evidence, and the only difference, in this respect, being the testimony of that witness then, and his testimony now.   Upon the testimony of this witness we submitted the question to the jury on the former trial, whether Gilbert L. Lloyd did take upon himself all risk of the title, and whether that testimony plainly showed that he did; * * * and, for this, the Supreme Court reversed the judgment on the verdict, thus ruling that this court should have rejected the evidence, or, having admitted it, should have withdrawn it from the jury. * * * [In most respects, his testimony is more full and explicit now than it was then, and the difference between the two statements would answer some of the criticisms of the ruling Justice Strong, in the opinion of the Supreme Court; but, upon examining it carefully, we cannot see that it is materially changed, as to the point upon which the cause was reversed.   It will be noted that the reversal was because the evidence went to prove another agreement going to contradict and change entirely the agreement of the parties at the time, without any allegation of mistake or fraud; and, secondly, and more especially, because there was a concealment by Thomas Farrell of the relation sustained by him to his sisters, or of the fact that he held the title for himself and in trust for his sisters; that he was really and only the owner of the one-third, while he undertook to sell the whole land. * * * Mr. Lloyd says there was not a word said about that subject; and it was upon this ground mainly, that it was ruled and held by the Supreme Court that the proof of that agreement by Mr. Lloyd should not have been submitted to the jury, and for that reason mainly the judgment was reversed; and the case is the same now, upon that vital point, that it was then. * * * The question

[Farrell *v.* Lloyd.]

would still be, whether *this* defect in the title was plainly included in this alleged agreement. But we cannot put any other construction upon the ruling of the Supreme Court, which it is our duty to obey and follow, upon this point, than that which settles it. And we, therefore, instruct you upon the whole case, that the defendant is entitled to a general verdict.]" * * *

The verdict was for the defendant.

The plaintiff having removed the record to the Supreme Court, there assigned for error—the rejection of Lemon's deposition and the parts of the charge in brackets.

*D. J. Neff* and *L. W. Hall,* for plaintiff in error.—A deed or agreement may be qualified by or made subject to a parol condition: Miller *v.* Henderson, 10 S. & R. 290; Bank *v.* Fordyce, 9 Barr 275; Renshaw *v.* Gans, 7 Barr 117; Lyon *v.* The Huntingdon Bank, 12 S. & R. 61; Rearich *v.* Swinehart, 1 Jones 233; Ludwick *v.* Huntzinger, 5 W. & S. 58; Parke *v.* Chadwick, 8 Id. 96; Ross's Appeal, 9 Barr 496; McClure *v.* McClure, 1 Jones 479.

*S. S. Blair,* for defendant in error.—Proof of payment of purchase-money, from which a trust results, must be such as would satisfy a chancellor: Barnet *v.* Dougherty, 8 Casey 371; Kline's Appeal, 3 Wright 463; Nixon's Appeal, 13 P. F. Smith 282; Capehart *v.* Capehart, 2 Phila. 204; Bennett *v.* Fulmer, 13 Wright 156; Hassler *v.* Bitting, 4 Id. 74.

Wm. Lloyd stated that nothing was said about the state of the title, and, therefore, there was no evidence that that risk was assumed which could be submitted to the jury. The intention to assume the risk may be fairly inferred when he knew of the defect at the time of the purchase, and made no provision against it in his agreement: Hart *v.* Porter, 5 S. & R. 204; Cadwalader *v.* Tryon, 1 Wright 319; Lighty *v.* Shorb, 3 Penna. R. 447; Steinhauer *v.* Whitman, 1 S. & R. 438. When the defect or encumbrance is unknown to the purchaser, it is of course impossible that he could have intended or expected to run the risk of it: Rawle on Cov. 533, 563. He referred also to Lloyd *v.* Lynch, 4 Casey 419; Lloyd *v.* Farrell, 12 Wright 73.

The opinion of the court was delivered, May 27th 1872, by
SHARSWOOD, J.—When the question of Thomas Farrell's title was before this court in Lloyd *v.* Lynch, 4 Casey 419, there was no evidence whatever that the land had been purchased by Barnabas Farrell with his money, but the case rested simply upon a parol declaration by Barnabas that he was buying for Thomas at the time of the purchase. Mr. Chief Justice Lewis said: "The mere declaration of a vendee that he intends to buy for another, with-

[Farrell *v.* Lloyd.]

out evidence of a previous agreement to do so, or of any advance of money for the purpose, raises no trust which can be supported." On this record, however, there is evidence which if believed is sufficient to supply that deficiency. There is the testimony of Jonathan Zerbe, who was the book-keeper at the Canoe Furnace, from which it may fairly be inferred that Thomas was able to save money out of his earnings, and had, at the very time of the purchase, money just then due and paid him, but that it was highly improbable that Barnabas had anything. But more directly in point is the testimony of William Yon. He said that in 1841 he went to the house where the Farrells lived to haul some wood for them. He found Barnabas before the door in his good clothes as about to go away on some business. He (the old man) "said he was going to the mountain to buy a piece of land. He said that Thomas had got a little money, and said he wanted to put it into land. He said he was going to buy a tract adjoining Burgoon's lands on the mountain. I told him I knew near about where Burgoon's lands were; that I had hauled coal from there. While we were talking, Thomas came out of the house and handed over some money to his father." Now here is evidence of a previous agreement by Barnabas to buy the land for Thomas, and of an actual advance of money by Thomas to do so—it matters not what the amount was, great or small. Coupled with the declaration by Barnabas to Collins at the time of the purchase that he was buying for Thomas, we think it should have been submitted to the jury to say whether the purchase had not actually been made at the time with money advanced by Thomas for that purpose, which would have created a valid resulting trust in his favor within the exception of the Statute of Frauds.

We are also of the opinion that the evidence of William M. Lloyd upon this trial, in regard to the agreement by Gilbert L. Lloyd on his purchase from Thomas Farrell to take all the risk of the title, was materially different from what it was on the former trial, when the case was under review in this court in Lloyd *v.* Farrell, 12 Wright 73. The witness then said nothing of what took place when the deed was delivered or after the article of agreement was made. His testimony as to what took place at the time of the agreement was indefinite. "We are not even informed," said Mr. Justice Strong, "whose understanding it was of which the witness spoke. Was it his own or that of the parties? Was it the witness's construction of the written agreement or of the conversation of Farrell and Lloyd? If, as is probable, the witness referred to the understanding of the parties, how did he gather it—from their negotiation or their written contract?" It is not disputed that in all these respects the testimony is now clear and definite. "On the day it (the article) was executed," says the witness, "Gilbert Lloyd came out from Hollidaysburg with the article prepared.

[Farrell *v.* Lloyd.]

He brought it into our office prepared. Farrell was present before the execution of the article and refused to sign it, alleging that it was not a conveyance of the tract, not in accordance with the agreement. Gilbert L. Lloyd said that the understanding of the parties was that Lloyd was to take the land—the Farrell title—at his own risk. They talked the matter over and both agreed to this. It was executed with that distinct understanding." "This was the understanding of the parties at the time they signed the deed. The same understanding was had in regard to the title at the signing of the deed as at the signing of the article of agreement : that is at the execution of the deed. I was there then and witnessed the deed. This understanding was the understanding of the parties, Gilbert Lloyd and Thomas Farrell. Farrell refused to sign on any other conditions." It is certainly true that if Thomas Farrell knew that there was a secret trust in favor of his sisters and fraudulently concealed that fact, he could not avail himself of this agreement, either at law or in equity. It would be void so far as their title was concerned. But that clearly was a question for the jury, and would depend very much upon the fact whether the land was bought with his, Thomas's, money. If he knew that to be so, he was not bound to disclose the fact that he had given a bond of indemnity against his sister's title to his vendors, Collins & Ross. If Farrell knew he had paid for the land though the original agreement was in his father's name, good faith did not require him to state to his vendee facts connected with it which he deemed of no importance. If, however, the fact was not so, and of course he must have known it—"that with such knowledge concealed in his own bosom," as Mr. Justice Strong well remarked in Lloyd *v.* Farrell, "he could have bound his ignorant vendee by an agreement to assume all the risk of a title, would be grossly inequitable. It is idle to say that any court of equity would enforce such a contract." It is evident, then, that whether there was a fraudulent concealment by Farrell of his sister's claim or title, was a question of fact which ought to have been submitted to the jury.

We see no error in the rejection of the deposition of Robert Lemon. Declarations by Gilbert Lloyd as to how much he had made by the speculation, were entirely irrelevant, and could only have tended to mislead the jury.

Judgment reversed, and *venire facias de novo* awarded.